182 Cal.App.4th 1367 (2010)
In re L.B., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent,
v.
L.B., Defendant and Appellant.
No. C061010.
Court of Appeals of California, Third District.
March 16, 2010.
CERTIFIED FOR PARTIAL PUBLICATION[*]
*1369 Thea Greenhalgh, under appointment by the Court of Appeal, for Defendant and Appellant.
Edmund G. Brown, Jr., Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Rachelle A. Newcomb, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION
RAYE, J.
In May 2008 an amended petition was filed, alleging that minor L.B., age 15, came within the provisions of Welfare and Institutions *1370 Code section 602 in that she committed three misdemeanors: battery on a school employee (Pen. Code, § 243.6count one), use of unlawful force on T.B. while on school property (Pen. Code, § 243.2, subd. (a)count two), and possession of a knife on school property (Pen. Code, § 626.10, subd. (a)count three).[1]
At that time, the juvenile court (Referee Lindsey) and the minor's counsel expressed doubt as to the minor's competency to stand trial. Proceedings were suspended and an evaluation was ordered.
In September 2008, following a contested competency hearing, the court (Judge Thorbourne) found the minor competent to stand trial. In December 2008 and January 2009 the minor's counsel again expressed doubts about her competency and requested that the court do likewise. The court (Referee Chrisman and Judge Thorbourne) denied both requests.
On January 6, 2009, following a contested jurisdiction hearing, the court (Judge Thorbourne) found true and sustained all three counts. The court set the maximum period of confinement at one year four months. The minor was placed on court probation for six months. (Welf. & Inst. Code, § 725, subd. (a).) She was ordered to perform 18 hours of informal community service and pay a $75 restitution fine.
On appeal, the minor contends (1) the court erred by failing to appoint the director of the regional center for the developmentally disabled to perform the competency evaluation, (2) the record contains insufficient evidence of competency, and (3) the true finding on count three is not supported by sufficient evidence of the length of the knife. We shall remand for further proceedings.

FACTS
On March 7, 2008, the lead teacher at UHS Keystone School saw the minor enter her classroom without permission and engage in a fight with T.B., a student. The minor approached T.B., asked whether she had been talking about the minor, and then struck T.B. in the arm without provocation. When the teacher tried to separate the girls, the minor grabbed T.B.'s hair, scratched her back, and tore off her shirt. T.B. received scratch marks down her back and bruises on her arm. During the separation process, the minor turned away from T.B. and intentionally struck the teacher on her arm, leaving a red mark. The entire incident lasted about two minutes.
A month later, on April 9, 2008, the minor and D.C., a student, were waiting in line at a security checkpoint on the school campus. The minor *1371 showed D.C. the handle of a knife that she had wrapped under her sweater. The minor explained that she had brought the knife to stab S.R., a girl with whom she had fought the previous day. D.C. told the minor not to stab S.R. and stated that she would tell the staff about the knife if the minor did not. After D.C. told behavioral specialist Clarence Shepard about the knife, Shepard confronted the minor, who then handed him the knife. The minor told Shepard that she was bringing the knife to scare S.R., not to hurt her. Shepard took the knife to the vice-principal and called the police.

DISCUSSION

I
The minor contends, and the Attorney General effectively concedes, the juvenile court erred when, after suspending proceedings and ordering a competency evaluation by a licensed psychiatrist or psychologist who could address, among other things, whether the minor "is mentally retarded," it failed to appoint the director of the regional center for the developmentally disabled to examine the minor. (Pen. Code, §§ 1369, subd. (a), 1370.1, subd. (a)(1)(H).)[2] The minor claims the error was prejudicial; the Attorney General terms it harmless. The minor has the better argument.
(1) "Like an adult defendant, a minor has a right to a competency hearing in juvenile delinquency proceedings." (In re Ricky S. (2008) 166 Cal.App.4th 232, 234 [82 Cal.Rptr.3d 432]; see James H. v. Superior Court (1978) 77 Cal.App.3d 169, 174-175 [143 Cal.Rptr. 398].) "The standard applied in adult criminal proceedings is also applied in juvenile delinquency proceedings, namely, whether the accused `"`has sufficient present ability to consult with his lawyer with a reasonable degree of rational understandingand whether he has a rational as well as factual understanding of the proceedings against him.'"' [Citation.]" (Ricky S., at p. 234; see Cal. Rules of Court, rule 5.645(d).)
Thus, when the juvenile court declares a doubt as to a minor's competence to stand trial, "The court shall appoint a psychiatrist or licensed psychologist, and any other expert the court may deem appropriate, to examine the [minor]. . . . If it is suspected the [minor] is developmentally disabled, the court shall appoint the director of the regional center for the developmentally disabled . . . to examine the [minor]." (§ 1369, subd. (a), italics added; see People v. Leonard (2007) 40 Cal.4th 1370, 1387-1388 [58 Cal.Rptr.3d 368, 157 P.3d 973] (Leonard).) "`[D]evelopmental disability' means a disability that originates before an individual attains age 18, continues, or can be *1372 expected to continue, indefinitely and constitutes a substantial handicap for the individual . . . . [T]his term shall include mental retardation, cerebral palsy, epilepsy, and autism." (§ 1370.1, subd. (a)(1)(H), italics added; see Leonard, at p. 1388.)
(2) Because the goal in both adult and juvenile cases is to determine whether the defendant or minor is competent, it would be anomalous to import the adult standard of competence into juvenile proceedings but not also import the section 1369 mechanism for ensuring that developmentally disabled minors are evaluated by experts experienced in the field. Neither party contends that section 1369 should not apply.
In this case, the juvenile court appointed Dr. Deborah Schmidt, a psychologist, to evaluate the minor. After conducting a clinical interview and administering a battery of psychological tests, Schmidt concluded in a written report that the minor "is not competent to understand the nature of the delinquency proceedings." The report revealed that the minor was "functioning intellectually in the moderate range of mental retardation" with a "Full Scale IQ of 46." Dr. Schmidt confirmed her written findings in live testimony at the competency hearing.
The Attorney General concedes that Dr. Schmidt's diagnosis raised sufficient suspicion of mental retardation for purposes of section 1369, subdivision (a) and section 1370.1, subdivision (a)(1)(H). Thus, the juvenile court's failure to appoint the director of the regional center was error.
(3) Leonard holds that this error is not reversible "unless the error deprived [the defendant] of a fair trial to determine his competency." (Leonard, supra, 40 Cal.4th at p. 1390.) Leonard explained that, although appointment of the regional center director serves three purposes, only one is relevant in this context: "to ensure that a developmentally disabled defendant's competence to stand trial is assessed by those having expertise with such disability." (Id. at p. 1389.) Leonard concluded that this purpose had been fulfilled because, even though the defendant, an epileptic, had not been evaluated by the director of the regional center, he had been evaluated by two qualified expertsa psychiatrist who had observed patients with seizures similar to those of the defendant, and a neuropsychologist who had treated many epileptic patients. (Id. at pp. 1390-1391.) The psychiatrist had found the defendant competent to stand trial; the neuropsychologist had not opined on the issue. (Id. at pp. 1386-1387.)
Leonard explained: "[A]ppointment of the director of the regional center for the developmentally disabled . . . is intended to ensure that a developmentally disabled defendant is evaluated by experts experienced in the field, *1373 which will enable the trier of fact to make an informed determination of the defendant's competence to stand trial. Here, defendant was evaluated by doctors who possessed these qualifications, and their testimony provided a basis for the trial court's ruling that defendant was competent to stand trial. Thus, the court's failure to appoint the director of the regional center to examine defendant did not prejudice defendant." (Leonard, supra, 40 Cal.4th at p. 1391, fn. omitted, italics added.)[3]
In this case, the parties stipulated to Dr. Schmidt's extensive expertise.[4] The Attorney General claims this case is similar to Leonard, in that the minor was "evaluated by an expert who understood [the minor's] disability and was qualified to advise the court about whether that disability might render [the minor] incompetent. Accordingly, as in Leonard, any possible error the court may have committed by failing to order an evaluation by the director of the regional center for the developmentally disabled was harmless."
The Attorney General overlooks two key distinctions between Leonard and the present case. First, the purpose of appointing the regional center director is to enable the trier of fact to make an informed determination of the defendant's competence to stand trial. The court in Leonard made an informed determination. Here, however, the juvenile court's misunderstanding of an important portion of Dr. Schmidt's testimony resulted in a determination that was fundamentally misinformed.
The juvenile court properly recognized that the issue was "whether or not the minor has a present ability to cooperate with counsel and understand the nature of these proceedings." But the minor's ability to understand the proceedings turned in part upon the extent of her mental retardation. At two points during the competency hearing, the court suggested that Dr. Schmidt had diagnosed only "mild mental retardation," and that the minor only "marginally suffers, has a mild case of mental retardation." (Italics added.)[5] No evidence or testimony supported these assertions.
*1374 Dr. Schmidt reported, and later testified, that the minor's full scale IQ is 46, "which is considered to be in the moderate range of mental retardation." She explained that "it's rare for [an IQ score] to be that low." In fact, Dr. Schmidt could not recall another case in which a person with an IQ of 46 had been found competent to stand trial. She noted that she had "found people functioning in the mentally retarded range, not the moderate range but in the mild range, to be competent simply because they were able to demonstrate adequate understanding of different concepts. But in this case that wasn't so." (Italics added.) This expert testimony utterly fails to support any suggestion that the minor's retardation is only "mild" or "marginal."
Leonard is distinguishable on a second, and equally important, point: unlike the experts in that case, Dr. Schmidt did not provide a basis for the juvenile court's ruling that the minor was competent to stand trial. In Leonard, one expert found the defendant competent and the other offered no opinion; thus, their testimony provided a basis for the trial court's ruling that the defendant was competent to stand trial. (Leonard, supra, 40 Cal.4th at p. 1391.) Here, in contrast, Dr. Schmidt, the only expert, found the minor incompetent; no expert testimony provided any basis for the court's contrary conclusion that the minor was competent. (Ibid.) Where, as here, the court fails to appoint the regional center director and the expert testimony fails to provide a basis for the court's ruling, nothing in Leonard allows us to deem the error harmless.
(4) Because the point that Dr. Schmidt was trying to makethe rarity of persons with an IQ of 46 being deemed competent to stand trialpresumably was within the special knowledge and expertise of the director of the regional center for the developmentally disabled, whose knowledge could be drawn from a wider sample of clinicians and patients, there is "`a reasonable chance, more than an abstract possibility,'" that the director would have made the same point more persuasively and successfully than did Dr. Schmidt. (In re Willon (1996) 47 Cal.App.4th 1080, 1097-1098 [55 Cal.Rptr.2d 245] (Willon), explaining People v. Watson (1956) 46 Cal.2d 818, 836 [299 P.2d 243] (Watson).) Under these circumstances, the failure to appoint the director was not harmless.
We note that in finding the minor competent, the juvenile court relied in part on the minor's asserted ability during the interview with Dr. Schmidt to remember the incidents at issue "in pretty good detail" and to describe "exactly what happened and why she wound up being charged." Thus, in the interview, the minor had claimed that, before she accidentally pushed her teacher, she had gotten into a fight with "Amanda," who had "hit [the minor] *1375 hard in the back of the head." The minor "turned around and `went off,'" evidently on Amanda, and she pushed the teacher when the teacher "tried to get in the middle" of the altercation.
However, Dr. Schmidt's report cautioned that the minor "typically made a poor reporter." The minor's mother had told Dr. Schmidt that the girl who had struck the minor on the back of the head was the one the minor planned to scare with the knife the following day. The mother's description suggests that the minor had been struck, not by T.B. in March 2008 but by S.R. the next month, and that the minor had conflated the two incidents.
The evidence at the ensuing jurisdiction hearing confirmed that the March 2008 incident involved T.B., not "Amanda," and that T.B. had not previously struck the minor. Thus, in her interview with Dr. Schmidt, the minor had not accurately recalled the motive for, or the minor victim of, the March 2008 incident. Although this hearing postdated the ruling on competence, its contents reinforce our conclusion that the conceded error was not harmless.
In addition to its reliance on the minor's recollection of the incident, the juvenile court relied on (1) the minor's understanding that, if found guilty, she might go to juvenile hall, (2) her understanding of probation ("you must follow instructions given to you and do what they ask you"), (3) her understanding of the role of the defense attorney ("the attorney `speaks for'" the minor), (4) her understanding of the role of the judge ("To tell what I did and read the paper"), (5) her desire to be found "not guilty," and (6) her demeanor in listening to the proceedings. Whether viewed singly or in combination, these factors do not demonstrate the minor's competence to such an overwhelming degree as to negate any reasonable chance of a more favorable result if evidence from the regional center director is received. (Willon, supra, 47 Cal.App.4th at pp. 1097-1098; Watson, supra, 46 Cal.2d at p. 836.)
We shall reverse the jurisdictional and dispositional orders and remand with directions to obtain an evaluation by the director of the regional center for developmental disabilities.

II, III[*]

*1376 DISPOSITION
The jurisdictional and dispositional orders are reversed and the matter is remanded to the juvenile court with directions to obtain an evaluation by the director of the regional center for developmental disabilities and for further proceedings consistent with this opinion.
Sims, Acting P. J., and Cantil-Sakauye, J., concurred.
NOTES
[*] Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts II and III.
[1] Count three was originally charged as a felony and later amended to a misdemeanor.
[2] All further statutory references are to the Penal Code.
[3] Leonard disapproved People v. Castro (2000) 78 Cal.App.4th 1402 [93 Cal.Rptr.2d 770] to the extent that it held that failure to appoint the director of the regional center "necessarily requires reversal of any ensuing conviction." (Leonard, supra, 40 Cal.4th at p. 1389.)
[4] On appeal, the minor attempts to retreat from her stipulation by suggesting that the director would have used more extensive testing to evaluate her adaptive functioning. We have no occasion to consider this suggestion.
[5] The categories of mental retardation overlap somewhat but not enough to account for the court's misunderstanding. The categories are:

"Mild"IQ level 50-55 to approximately 70;
"Moderate"IQ level 35-40 to 50-55;
"Severe"IQ level 20-25 to 35-40; and
"Profound"IQ level below 20 or 25.
(American Psychiatric Assn., Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000, text revision) p. 42.)
[*] See footnote, ante, page 1367.